IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE COMPLAINT  ) <br> OF NATURES WAY MARINE, LLC,  ) <br> *Owner of the Tank Barge NWM 431 or AO 431*  ) <br> *(Hull No. D 557753) for Exoneration from or*  ) <br> *Limitation of Liability*  ) | CIVIL ACTION NO. 12-00390-KD-N |

**ORDER**

This matter is before the Court on Natures Way Marine, LLC ("Natures Way")'s [Partial] Motion for Summary Judgment (Docs. 241-243)[1] on Charles Brunson ("Brunson")'s negligence claim against it.[2]

**I.    Background**[3]

A personal injury lawsuit, filed by temporary laborer Charles Brunson ("Brunson"), regarding his alleged exposure to toxic chemicals while cleaning a barge on the Theodore

---

[1] In Norfolk Shipbuilding & Drydock Corp. v. Garris, 532 U.S. 811, 818-819 (2001), the Court held that the LHWCA expressly pre-empts all other claims [against the employer and vessel owner], but it expressly preserves all claims against third parties: "[T]he [LHWCA] provides nonseaman maritime workers...with no-fault workers' compensation claims (against their employer, § 904(b)) and [vessel] negligence claims (against the vessel, § 905(b)) for injury and death. As to those two defendants, the LHWCA expressly pre-empts all other claims, §§ 905(a), (b), but it expressly preserves all claims against third parties, §§ 933(a), (i)."  Thus, it would appear that Brunson's remaining state law claim (wantonness) against Natures Way is also due to be dismissed.  However, this issue has not been addressed by either party.

[2] While Natures Way technically has until October 4, 2013 within which to file a Reply to Brunson's Response (Doc. 263), the undersigned finds that no further briefing is necessary to resolve the pending motion.

[3] At the summary judgment stage, the facts are taken in the light most favorable to the non-movant.   Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v.. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

Industrial Canal in Mobile County, Alabama, spawned a number of claims, cross-claims, and counter-claims among five (5) parties. This particular motion is rooted in Natures Way's contention that Brunson's negligence claim against it (Doc. 50 at 5-6) lacks merit because Natures Way did not breach any turnover duties owed to Brunson under the *Longshore and Harbor Worker's Compensation Act* ("LHWCA"), 33 U.S.C. § 905(b).

On August 19, 2010, Natures Way purchased a barge.[4] (Doc. 242-1). Natures Way then hired U.S. Environmental Services, LLC ("USES")[5] to clean the barge. (Doc. 242-2 (Dep. J.Spencer at 10-11); Doc. 242-3 (Dep. W.Blackmon at 22-24)).

On August 25, 2011, marine chemist Tom Littlepage ("Littlepage") inspected the barge by boarding, visually observing, and chemically testing the barge and its tanks for dangerous conditions (*i.e.*, conducted the chemical certification process of the barge). (Doc. 242-5 (Aff. T.Littlepage)). In so doing, Littlepage observed small amounts of "bunker residue" in the barge's cargo tanks 1, 2, and 3, but determined that the residue did not render the barge or its tanks unsafe for work: "[i]f the residue had been in such a state or quantity to be unsafe for workers, that would have been noted on the Certificate." (Id. at 2 (Aff. Littlepage at ¶8)). Additionally, Littlepage tested the barge tanks for impermissible concentrations of oxygen, flammable gas and toxic materials; he did not detect any hazardous conditions or toxic chemicals on the barge or its tanks that would have rendered the atmosphere dangerous to workers. (Id.) Littlepage designated the atmosphere as "safe for workers" on the corresponding marine

---

    4 Tank Barge NWM 431 or AO 431-Hull NO. D 557753.

    5 USES is a company that provides environmental, industrial, and marine cleaning and safety services to a broad range of customers, including maritime customers. (Doc. 191-1 (Aff. T.Bayham)).

certificate.[6]  (Doc. 242-4 (Certificate)).  Moreover, Littlepage concluded that the barge was typical of a "No. 6 Oil Barge" and that its conditions did not present a danger to those individuals coming aboard.  (Doc. 242-4 (Certificate); Doc. 242-5 (Aff. Littlepage)).  Thus, as of August 25, 2011, the barge was certified as being clean and gas free by Littlepage via issuance of Marine Chemist Certificate Serial No #063740.  (Doc. 242-4 (Certificate); Doc. 242-2 at 3, 5 (Dep. J.Spencer at 10, 15)).

Littlepage summarized the findings in his Marine Chemist Certificate as follows: "as of 8/25/2011, all necessary tests for hazards associated with the vessel and cargo were performed[]" and "[t]here was nothing in my examination, inspection, or testing….which was unusual or significantly different than prior inspections of similar barges which carried such cargo [heavy fuel or bunker oil]. Again, had I observed any condition or situation within the tanks….that presented danger to workers who might enter the tanks, the certificate would have reflected the same and/or indicated that precautions be taken or – if warranted – that no entry be made." (Doc. 242-5 at 3 (Aff. T.Littlepage at ¶9-10).  Littlepage added that the certificate would be void if "anything was placed in the tanks after my inspection[]" because "[a]ny change in conditions (e.g., placing of cargo of any sort in the tank barge) would require re-evaluation and issuing of another Certificate."  (Id. (Aff. T.Littlepage at ¶9)).

After the marine certificate was issued on August 25, 2011, Natures Way did not store or place any cargo in the barge's tanks, and the barge did not move its position (it was docked at Apex facility in Theodore, AL).  (Doc. 242-2 at 4-6 (Dep. J.Spencer at 11, 15-16)).  Likewise, after August 25th, no one from Natures Way returned to the barge until after Apex had cleaned

---

[6] In the event Littlepage had discovered unsafe conditions, he would have noted same on the marine certificate as "enter with restrictions" or "not safe for workers."  (Doc. 242-5 (Aff. T.Littlepage)).  Littlepage made no such notations.  (Doc. 242-4).

the barge at the end of its charter (to ensure compliance – *i.e.*, that Apex left the barge clean and gas free).  (Id. at 6-7 (Dep. J.Spencer at 16-17)).   There is no evidence that the barge's condition changed in any way after it was certified by Littlepage on August 25, 2011 and prior to it being turned over to Apex on September 6, 2011.   (Doc. 242-2 (Dep. J.Spencer at 10-11); Doc. 242-6 (Dep. B.Haas at 21-22); Doc. 242-7 (Dep. G.Hayes at 27, 30-31)).

On September 6, 2011, barge owner Natures Way executed a charter agreement with Apex to transport "rainwater/wastewater" cargo.  (Doc. 179-4).   Pursuant to this charter agreement, Natures Way agreed to deliver possession of the barge to Apex at Apex terminal, and both parties agreed that the cargo to be carried would be rainwater/wastewater. (Id.) Additional conditions included that Apex would return the barge in a "gas free" and clean condition, and that the agreement would be governed by general maritime law with venue in the Southern District of Alabama.   (Id.)   On September 6, 2011, Apex took delivery of the barge. According to Apex employee Brian Haas, when the barge was delivered to Apex by Natures Way it was clean and he did not smell anything out of the ordinary.   (Doc. 242-6 at 5-7 (Dep. B.Haas at 20-22)).

According to Natures Way, once chartered on September 6, 2011, it relinquished control of the barge to Apex and did not return to the barge for any kind of operations during the charter period.  (Doc. 242-2 (Dep. J.Spencer at 15-17); Doc. 242-7 (Dep. G.Hayes at 27, 30-31)). Natures Way only later returned to the barge, after the completion of the charter period, to inspect it.   (Id.)

During the charter, Apex used the barge's tanks to temporarily store rainwater/wastewater which had collected on Apex's premises from Tropical Storm Lee.   (Doc.

4

242-7 at 5 (Dep. G.Hayes at 31)). Apex then pumped it back out into the Apex system for processed water. (Id.) Before the charter was complete, and after Apex transferred the rainwater/wastewater from its facility to the barge tanks, Apex hired USES[7] to remove the rainwater and clean the barge and its tanks. (Doc. 242-3 at 3-5 (Dep. W.Blackmon at 22-24)).

From September 26-29, 2011, USES performed the work of removing and offloading rainwater from the barge and cleaning the barge by having three (3) workers pressure wash the interior of its tanks and pump out excess rainwater. (Docs. 1, 50, 59; Doc. 242-3 at 6-7 (Dep. W.Blackmon at 52-53)). Pursuant to a previously executed August 13, 2010 contractual agreement[8] for temporary labor between USES and Flexicrew Staffing, Inc. ("Flexicrew"),[9] USES (via Justin Plant) hired Flexicrew to provide two (2) additional workers to clean the barge's tanks. (Doc. 187-3 at 1-7; Doc. 242-3 at 6-7 (Dep. W.Blackmon at 52-53)). Natures Way was not present (via agent or employee) during the cleaning operation. (Doc. 242-2 (Dep. J.Spencer at 16)).

Brunson, hired earlier by Flexicrew on September 4, 2011, was one of the individuals assigned to clean the barge's tanks. (Docs. 1, 50, 59; 179-2 at 5 (Dep. Brunson at 131)). Brunson's duties included performing safety work as "hold watch" on the barge's topside, and wiping down the stairs leading into the body of the tanks in the barge. (Doc. 179-2 at 8, 19-23

---

[7] Apex was required, as a condition of the charter agreement with Natures Way, to employ the services of a third party. (Doc. 179-4).

[8] Two contracts between USES and Flexicrew were submitted, dated July 26, 2010 and August 13, 2010. Flexicrew admits that the August 2010 contract governs Apex's claims (Doc. 209 at 4); USES' corporate representative testified that the August 2010 contract governs (Doc. 187-9 at 18-9 (Dep. T.Bayham at 27-28)); and Apex contends as such (Docs. 187-1 at 10, 219 at 1, 9, 15).

[9] Flexicrew is a staffing company which provides temporary skilled/unskilled laborers to other businesses; Brunson was one of its employees. (Doc. 187-4 at 3, 5 (Dep. A.March at 11, 13)).

(Dep. Brunson at 160, 296-300)).   Brunson cleaned the tanks until September 29, 2011.   (Doc. 50; Doc. 179-2 at 18-19 (Dep. Brunson at 295-296); Doc. 258-4 at 6-9 (Dep. M.Lomas at 18-20, 22)).   While cleaning, he reported that a rash had developed on his arm and leg and that he was losing his hair.   (Id.)   During the time the barge was being cleaned, no one other than Brunson reported any injuries.   (Doc. 242-6 at 3 (Dep. B.Haas at 18)).

Natures Way employees boarded the barge at the end of September 2011 to inspect it to make sure it complied with the charter with Apex – that the barge was gas free and had been cleaned.   (Doc. 242-2 at 6-7 (Dep. J.Spencer at 16-17)).   Apex was satisfied with the cleaning work that USES performed.   (Doc. 242-7 at 6 (Dep. G.Hayes at 50)).

On October 7, 2011, Brunson sought medical treatment and was diagnosed with chemical exposure injuries including permanent injuries; he underwent surgery, insertion of a J-tube (a feeding tube), was placed on a liquid diet, and continues to suffer from the effects of the exposure.   (Docs. 1, 50).

## II.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   FED. R. CIV. P. 56(a) (Dec. 2010).   Rule 56(c) provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment.  Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992) (internal citations and quotations omitted).

## III. Discussion

The LHWCA provides a right of action against the owner of the vessel if a longshoreman's injuries were caused by the owners' negligence or its crew. 33 U.S.C. § 905(b). For an injured LHWCA worker to recover from the vessel owner for negligence, the defendant must be a vessel owner under Section 905(b) and must have breached a duty to the worker. See, e.g., Marine Terminals v. Burnside Shipping Co., 395 U.S. 404, 415 (1969). "The claimant [Brunson] bears the initial burden of showing negligence[.]" Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp., 768 F.2d 1558, 1564 (11th Cir. 1985).

Brunson has alleged that Natures Way breached its turnover duty. (Doc. 50 at 5-6). Specifically, Brunson contends that Natures Way violated Section 905(b) because it failed to "exercise ordinary care under the circumstances to turn over the barge in a condition which would allow USES to carry out operations with reasonabl[e] safety…" (Doc. 285 at 2). Brunson also alleges that Natures Way failed "to warn Plaintiff of the latent and hidden dangers which were known or should have been known to it." (Id. at 2-3).

Given Brunson's allegations, this Court must determine whether he can sustain a claim for negligence against Natures Way per the Scindia Steam Nav. Co. v. De Los Santos, 451 U.S. 156 (1981) criteria (re: turnover duties that shipowners owe longshoremen).[10] See also Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 98 (1994); In re Knudsen, 710 F. Supp.2d 1252, 1269-1274 (S.D. Ala. 2010). The turnover duty applies to the ship owner's obligations *before* the commencement of work aboard the vessel. See, e.g., Moore v. M/V Angela,, 353 F.3d 376, 380 (5th Cir. 2003). The turnover duty places two responsibilities on the vessel owner. First,

---

10 Neither the "active operations duty" nor "duty to intervene" are asserted by Brunson; thus, they are not at issue in this case.

"[a] vessel must 'exercise ordinary care under the circumstances' to turn over the ship and its equipment and appliances 'in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care' to carry on cargo operations 'with reasonable safety to persons and property.'"  Howlett, 512 U.S. at 98. See also Scindia, 451 U.S. at 167; In re Knudsen, 710 F.Supp.2d 1252, 1269 (S.D. Ala. 2010).

Second, a corollary requires the vessel to warn the stevedore "'of any hazards on the ship or with respect to its equipment,' so long as the hazards 'are known to the vessel or should be known to it in the exercise of reasonable care,' and 'would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.'" Howlett, 512 U.S. at 99. See also Kirksey, 535 F.3d at 392; In re Knudsen, 710 F.Supp.2d at 1273-1274. "[T]he duty attaches only to latent hazards…In addition, the vessel's duty to warn is confined to latent hazards that 'are known to the vessel or should be known to it in the exercise of reasonable care.' Absent actual knowledge of a hazard, then, the duty to warn may attach only if the exercise of reasonable care would place upon the shipowner an obligation to inspect for, or discover, the hazard's existence." Howlett, 512 U.S. at 99-100.  The duty to warn is narrow; it does not include dangers which are open or obvious, or which a reasonably competent contractor should anticipate encountering. Id. See also Kirksey, 535 F.3d at 392; In re Knudsen, 710 F.Supp.2d at 1273-1274.

Additionally, "fault in the abstract is not sufficient. To produce liability, the acts of negligence or conditions of unseaworthiness must be a contributory and proximate cause of the

9

accident." In re Royal Caribbean Cruises Ltd., 2013 WL 425837 (S.D. Fla. Feb. 4, 2013) (citing Hercules, 768 F.2d at 1566).  Thus, breach of a turnover duty is actionable only if it is the legal cause of the injury – *i.e.*, the breach of a Scindia duty must have been a "substantial factor" in the injury.  See, e.g., Moore, 353 F.3d at 383; In re Knudsen, 710 F.Supp.2d at 1269.

Brunson contends that Natures Way violated its duty to warn due to: 1) the existence of bunker residue in the barge tanks on August 25, 2011 which was not tested; and 2) the lapse of 12 days between the issuance of the August 25th marine chemist certificate and the September 6th charter commencement date.  (Docs. 257, 258).  Brunson asserts: "[i]t is clearly a breach of the turnover duty not to warn … [Brunson] that …[it] did not know the nature of the residue. At the very least, …[Natures Way] had the duty to alert… [Brunson] to the fact that it did not know what chemicals were in the barge."  (Doc. 258 at 6, 11). Relying on 29 C.F.R. 1915.11(b), Brunson contends that Natures Way was negligent because Littlepage did not test or analyze "bunker residue" and/or certify that said residue did not contain toxic or hazardous materials, so further testing was "critical."  (Doc. 258 at 2).

29 C.F.R. Part 1915.11(b) references conditions "at the time of the inspection" and "existing atmospheric conditions" and defines, in part, "Safe for Workers" as follows:

> …denotes a space that meets the following criteria: (1) The oxygen content of the atmosphere is at least 19.5 percent and below 22 percent by volume; (2) The concentration of flammable vapors is below 10 percent of the lower explosive limit (LEL); **(3) Any toxic materials in the atmosphere associated with cargo,** fuel, tank coatings, **or inerting media are within permissible concentrations at the time of the inspection;** and **(4) Any residues or materials associated with the work authorized by the Marine Chemist,** Certified Industrial Hygienist, or competent person **will not produce uncontrolled release of toxic materials under existing atmospheric conditions while maintained as directed**….

29 C.F.R. Part 1915.11(b) (emphasis added).  Appendix A to Subpart B of Part 1915 provides

10

explanations of the standard for work in confined and enclosed spaces such as a tank: "[a]ny activity in the tank could change the atmospheric conditions in that tank… Manual tank cleaning with high pressure spray devices can stir up residues and result in exposures to toxic contaminants. Simple cleaning or mucking out, where employees walk through and shovel residues and sludge, can create a change in atmospheric conditions."

The August 25, 2011 Marine Chemist Certificate provides that the three (3) cargo tanks are "Safe for Workers." (Doc. 242-4 at 2).  Littlepage noted the presence of small amounts of bunker residue, noted its consistency of "oily peanut butter," that it rendered the space "inappropriate for hot work" (which Brunson did not perform),[11] and concluded that it was not in such a state or quantity to be unsafe for workers.  (Doc. 242-5 at 2 (Aff. Littlepage)). Additionally, as detailed on the face of the Marine Chemist Certificate, per Section 1915, the certificate would be voided only "in the event of physical or atmospheric changes affecting the Standard Safety Designations."  (Doc. 242-4 at 2).  Littlepage explained this in his affidavit -- that if any cargo were placed in the barge tanks *after* the August 25th inspection: "this would void the Certificate. This is made clear on the face of the certificate. Any change in conditions (e.g., placing of cargo of any sort in the tank barge) would require re-evaluation and issuing of another Certificate. This is in accord with applicable standards...which govern safety aboard tank vessels and/or confined space entry."  (Doc. 242-5 at 3 (Aff. Littlepage at ¶9)).

Brunson has not identified any physical or atmospheric changes affecting the Standard Safety Designations, to either void the August 25th certificate or require

---

[11] 29 C.F.R. Part 1915.11(b) defines hot work as: " any activity involving riveting, welding, burning, the use of powder-actuated tools or similar fire-producing operations. Grinding, drilling, abrasive blasting, or similar spark-producing operations are also considered hot work except when such operations are isolated physically from any atmosphere containing more than 10 percent of the lower explosive limit of a flammable or combustible substance."

re-evaluation/re-inspection and issuing of another certificate before turnover of the barge on September 6, 2011.   There is no evidence that the tanks were disturbed in any manner between August 25-September 6, 2011.   Thus, the lapse of time alone does not support Brunson's contention of a breach of Natures Way's turnover duty.

Brunson's failure to test the bunker residue claim appears to be as follows: Natures Way is liable because the "August 25 bunker residue" remained in the barge's tanks through September 27-29 when he cleaned the tanks and that specific residue made him sick when activity in the tank -- manual tank cleaning and mucking out -- disturbed things.   (Doc. 258 at 3).   However, Brunson has failed to present any evidence (e.g., findings by a chemist or expert) that the August 25, 2013 bunker residue created or could have created an unsafe work environment such that Natures Way had a duty to warn of its existence.[12]   Nor has Brunson presented any law or evidence that Natures Way's failure to test the residue before turning the barge over to Apex constituted negligence.

Finally, "fault in the abstract is not sufficient. To produce liability, the acts of negligence …must be a contributory and proximate cause of the accident."   In re Royal Caribbean Cruises Ltd., 2013 WL 425837 (S.D. Fla. Feb. 4, 2013) (citing Hercules, 768 F.2d at 1566). A breach of a turnover duty is actionable only if it is the legal cause of Brunson's injury. See, e.g., Moore, 353 F.3d at 383; In re Knudsen, 710 F.Supp.2d at 1269.   Brunson has submitted evidence which

---

12 Brunson has submitted the May 10, 2012 lab results from Armstrong Forensic Laboratory, Inc., where a lab tested three (3) of the boots that Brunson was wearing when he cleaned the tanks in late September 2011.   (Doc. 258-15).   Brunson supplied these to a lab on April 30, 2012, over seven (7) months after he cleaned the tanks, but asserts that he had not worn them in the interim.   (Id; Doc. 258-16 at 5-6 (Dep. Brunson at 226-227)).   The results of the testing revealed the presence of quartz, calcite and goethite, without explanation of their significance by the technicians.   (Doc. 258-15 at 8). Brunson provided no further explanation of these results and/or how they causally relate to his cleaning of the tanks in September 2011 and the injuries he claims to have suffered as a result of the untested residue.

creates an issue of fact as to whether his injuries were due to exposure to toxic chemicals. However, Brunson has failed to present sufficient evidence that Natures Way's conduct of leaving residue in the barge was a contributory and proximate cause of his injuries, particularly given Apex' intervening use of the barge.

**V.**     <u>**Conclusion**</u>

Accordingly, it is **ORDERED** that Natures Way's Partial Motion for Summary Judgment (Docs. 241-243) on Brunson's negligence claim is **GRANTED.**

**DONE** and **ORDERED** this the **1st** day of **October 2013.**

<u>/s/ Kristi K. DuBose</u>
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**
