IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

IN THE MATTER OF THE COMPLAINT   )
OF NATURES WAY MARINE, LLC, Owner )
*of the Tank Barge NWM 431 or AO 431*   )      **CIVIL ACTION NO. 12-00390-KD-N**
*(Hull No. D 557753) for Exoneration from or*   )
*Limitation of Liability*              )

## ORDER

This matter is before the Court on Flexicrew Staffing, Inc. ("Flexicrew")'s Motion for

Summary Judgment against Natures Way Marine, LLC ("Natures Way") and Apex, LLC, d/b/a

FCC Oilfield Services ("Apex") (Docs. 178-180), Natures Way's Response (Doc. 200), Apex's

Response (Doc. 201), Flexicrew's Replies (Docs. 205-206) and Apex's Sur-Reply (Doc. 224);

and U.S. Environmental Services, LLC ("USES")'s Motion for Summary Judgment against

Natures Way and Apex (Docs. 190-192), Apex's Responses (Doc. 216), Natures Way's

Response (Doc. 217), and USES' Reply (Docs. 225, 226).

## I.    Background

A personal injury lawsuit filed by temporary laborer Charles Brunson ("Brunson"),

regarding his alleged exposure to toxic chemicals while cleaning a barge on the Theodore

Industrial Canal in Mobile County, Alabama, spawned a number of claims, cross-claims, and

counter-claims among five (5) parties. As a result of this limitation of liability action filed by

Natures Way, Apex filed a cross-claim against Flexicrew for indemnity/contribution (contractual

and otherwise), alleging negligence within the indemnity claims, asserting it is a third party

beneficiary to the August 13, 2010 labor staffing contract ("the contract")[1] executed between

---

1 The contract contains a choice of law provision which specifies: "[t]his Agreement will be interpreted in
accordance with the laws of the State of Louisiana[]" and "[t]his Agreement is to be governed by and construed

1

USES[2] and Flexicrew.[3]  (Doc. 175).   Additionally, Apex filed a separate suit for declaratory judgment against Flexicrew, CV 12-00507-WS-N, regarding its claim for indemnity which was consolidated, for all purposes, into the present case.   (Doc. 58 at 2).

The relevant factual background is as follows.   On September 6, 2011, barge[4] owner Natures Way Marine, LLC ("Natures Way") executed a charter agreement with Apex; Natures Way was the owner and Apex was the charterer.   (Doc. 179-4).   Apex planned to use the barge to transport "rainwater/wastewater" cargo.   (Id.)   A condition of the agreement was that Apex would return the barge to Natures Way in a "gas free" and clean condition.   (Id.)   After transferring the rainwater/wastewater from its facility to the barge tanks and back out for processing, Apex hired USES to remove the rainwater and clean the barge – *i.e.*, to provide a clean and "gas free" barge.   Specifically, pursuant to a previously executed August 13, 2010 contractual agreement for temporary labor between USES and Flexicrew, USES hired Flexicrew in September 2011 to provide two (2) laborers to clean the barge's tanks.

The USES-Flexicrew contract provides, in relevant part, as follows:

> This Agreement…..between…..USES or "contractor"[] and Flexicrew…… "subcontractor"[] concerns services and work to be provided by you [Flexicrew] as a subcontractor to us [USES], regarding a project to be performed for our client.
>
> * * *
>
> ….This Agreement describes the work that you [Flexicrew] will do for us [USES], and the terms of our relationship. This Agreement may be used for a single project, or may serve as a master services agreement for a series of projects. You [Flexicrew] agree to work as an independent contractor, and not as an employee of us.

---

according to the laws of the State of Louisiana."   (Doc. 187-3 at 7).

2  USES is a company that provides environmental, industrial, and marine cleaning and safety services to a broad range of customers, including maritime customers.   (Doc. 191-1 (Aff. T.Bayham)).

3  Flexicrew is a staffing company which provides skilled/unskilled laborers to other entities. (Doc. 179-1 at 2 (Dep. A.March)).

4  Tank Barge NWM 431 or AO 431-Hull NO. D 557753.

* * *

You [Flexicrew] agree to provide the services described as follows, and referred to as the Work: certified job specific supervisors, foreman and field techs…Administration Personal [sic]…job specific necessary transportation equipment…It is specifically agreed that for purposes of workers compensation, we [USES] are a statutory employer of you [Flexicrew], your [Flexicrew's] employees, subcontractors and suppliers and that you [Flexicrew] will maintain workers compensation insurance…

* * *

You [Flexicrew] will indemnify us [USES], as provided in Section 8.

* * *

8.   <u>Indemnification</u>.

To the full extent permitted by law, subcontractor [Flexicrew] agrees to defend, indemnify and save harmless contractor [USES], owner and any other party which contractor is required to defend, indemnify and save harmless under any project related contract, including but not limited to their officers, agents, servants and employees, from and against any claim, allegation, cost, expense, or liability (including pre-suit and post suit attorneys' fees, interest, investigative or any other expense related in any way to the claim or allegations), attributable to bodily injury, sickness, disease, death, damage to destruction of property (including loss of use thereof), resulting from, occurring in connection with or connected in anyway to the subcontractor's [Flexicrew's] work, its subcontractors, sub-subcontractors, materialmen, or agents of any tier, their officers, directors, agents, or employees, whether or not caused in part, directly, indirectly, by the active or passive negligence or any other fault of a party indemnified hereunder provided, however, subcontractor's [Flexicrew's] duty hereunder shall not arise if such injury, sickness, disease, death, damage, or destruction is caused by the sole negligence of a party indemnified hereunder.

Subcontractor's [Flexicrew's] obligation hereunder shall not be limited by the provisions of any worker's compensation or similar act.

Subcontractor's [Flexicrew's] obligations under this provision continue after final payment and acceptance of the work and are applicable to the operations and completed operations of the subcontractor.

* * *

…This Agreement will be interpreted in accordance with the law of the State of Louisiana….

* * *

Choice of Law/Venue: This Agreement is to be governed by and construed according to the laws of the State of Louisiana….

(Doc. 201-1).

From September 26-29, 2011, USES performed the work of removing rainwater from the barge and cleaning the barge, for Apex, by having workers pressure wash the interior of its tanks and pump out excess rainwater.   (Docs. 1, 50).   Brunson, hired by Flexicrew on September 4, 2011, was one of the workers assigned to clean the barge's tanks.   (<u>Id</u>.; Doc. 179-2 at 10, 11

3

(Dep. Brunson at 277, 279)). Brunson cleaned the tanks in the barge, located on the Theodore Industrial Canal, until September 29, 2011 (about 29.5 hours of cleaning over 3 days. (Docs. 1, 50; Doc. 179-2 at 14-20 (Dep. Brunson at 284-287, 295-297)). Thereafter; he reported that he was suffering hair loss, skin irritation, nausea, and vomiting. (Id.) As alleged, on October 7, 2011, Brunson sought medical treatment and was diagnosed with chemical exposure injuries including permanent injuries. (Docs. 1, 50). Brunson underwent surgery, the insertion of a J-tube, was placed on a liquid diet, and continues to suffer from the effects of the alleged exposure. (Id.)

In 2011, Brunson filed a compensation claim under the *Longshore and Harbor Workers' Compensation Act* ("LHWCA"), 33 U.S.C. § 901 *et seq*., against Flexicrew. On December 27, 2011, Flexicrew's insurance carrier denied Brunson's claims. (Doc. 200-4). To date, Flexicrew has not paid any LHWCA benefits to Brunson.

## II.     Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). Rule 56(c) provides as follows:

*(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

**(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that

would be admissible in evidence.

> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010). The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992) (internal citations and quotations omitted).

III.   **Flexicrew and USES' motions as to Natures Way's claims against them**

On October 1, 2013, this Court granted Natures Way's motion for summary judgment as to Brunson's negligence claims against it. (Doc. 267). In so doing, Brunson's remaining claim against Natures Way for wantonness, was rendered moot. (Id. at 1 at note 1). As a result, and per Natures Way's own representations (Doc. 242 at 1 at note 1), said ruling moots

Natures Way's claims against Flexicrew (Doc. 25) and USES (Doc. 124). Accordingly, Natures Way's counterclaims against Flexicrew (Doc. 25) and USES (Doc. 124) are **DISMISSED** and those portions of both Flexicrew and USES' respective motions for summary judgment relating to same (Docs. 178-180, 190-192) are **DENIED** as **MOOT.**

## IV.    USES' motion as to Apex's claims against it

USES moved for summary judgment on Apex's claims against it for indemnity and contribution (Apex alleged that to the extent it is held liable to Brunson for his injuries, it has a right to indemnity/contribution from USES as a third party beneficiary to the 2010 USES-Flexicrew contract).   (Docs. 36, 53, 175).   Specifically, USES asserts that as Brunson's "employer" it is immune from his suit under 1) Section 905(a); and 2) Section 905(b) because (assuming Apex's status as a vessel), USES is Brunson's "borrowing employer" and Brunson's claims are thus barred.   Upon consideration, it appears that genuine issues of material fact exist as to the <u>Langfitt v. Federal Marine Terminals, Inc.</u>, 647 F.3d 1116 (11th Cir. 2011) borrowing employer factors, and thus, USES' status as a "borrowing employer."   As such, it is **ORDERED** that the portion of USES' motion for summary judgment relating to Apex's claims against it (Docs. 190-192) -- is **DENIED at this time.**[5]

## V.    Flexicrew's motion as to Apex's claims against it

The LHWCA establishes a comprehensive federal workers' compensation program that provides covered employees and their families with medical, disability, and survivor benefits for work-related injuries and death.   <u>Howlett v. Birkdale Shipping Co.</u>, 512 U.S. 92, 96 (1994). Section 904 of the LHWCA allows maritime employees to recover compensation from their

---

[5] USES did not move for summary judgment on the basis that Apex is not a third party beneficiary to the contract.

employers for certain injuries "irrespective of fault as a cause for the injury."  33 U.S.C. §

904(b). Because the employer is subject to liability to compensate the employee regardless of

fault, the LHWCA, by its express terms, makes this recovery the exclusive liability of an

employer (to an employee) per Section 905(a):

> The liability of an employer prescribed in section 904 of this title shall be exclusive and
> in place of all other liability of such employer to the employee…except that if an
> employer fails to secure payment of compensation as required by this chapter, an injured
> employee…may elect to claim compensation under the chapter, or to maintain an action
> at law or in admiralty for damages on account of such injury…

"Employees covered by the LHWCA are thus statutorily barred from suing their employers for

injuries incurred in the course of their employment."  <u>Curry v. Boh Bros. Const. Co., L.L.C.</u>,

2006 WL 517650, *2 (N.D. Fla. Mar. 2, 2006).   However, Section 905(b) provides, in relevant

part, that a covered employee may also sue the vessel, in a separate action, as a third party if his

injury was caused by the negligence of a vessel:

> In the event of injury to a person covered under this chapter caused by the negligence of a
> vessel, then such person, or anyone otherwise entitled to recover damages by reason
> thereof, may bring an action against such vessel as a third party in accordance with the
> provisions of section 933 of this title, and the employer shall not be liable to the vessel
> for such damages directly or indirectly and any agreements or warranties to the contrary
> shall be void. If such person was employed by the vessel to provide stevedoring services,
> no such action shall be permitted if the injury was caused by the negligence of persons
> engaged in providing stevedoring services to the vessel. If such person was employed to
> provide shipbuilding, repairing, or breaking services and such person's employer was the
> owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall
> be permitted, in whole or in part or directly or indirectly, against the injured person's
> employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent,
> operator, or charterer) or against the employees of the employer….The remedy provided
> in this subsection shall be exclusive of all other remedies against the vessel except
> remedies available under this chapter.

<u>See also</u> <u>Curry</u>, 2006 WL 517650, *2.   Thus, vessels are liable for negligence to maritime

employees who are injured while on the vessel.

However, because an employer is liable to the maritime employee regardless of fault, the LHWCA immunizes the employer from suits for contribution or indemnity by the vessel. As noted *supra*, the Act expressly provides that where an injured employee brings an action against a vessel for damages, "the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void." 33 U.S.C. § 905(b). As the Supreme Court has stated, "§ 905 permits the injured longshoreman to sue the vessel and exempts the employer from any liability to the vessel for any damages that may be recovered." Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 268 (1979).[6] Furthermore, "the 1972 Amendments make quite clear that 'the employer shall not be liable to the vessel for such damages directly or indirectly.'" Id. at 270 (emphasis in original). See also Pippen v. Shell Oil Co., 661 F.2d 378, 386 (5th Cir. 1981) (stating that § 905(b) "expressly forbids an action by the vessel against the employer for damages for an injury caused by the negligence of the vessel" and "Section 905(b) of the [Act] cuts off the right of a vessel ... to recover contribution or indemnity from the employer[]"); In re Knudsen, 710 F.Supp.2d 1252, 1268 at note 9 (S.D. Ala. 2010) (stating that "§ 905(b) explicitly prohibits indemnity action by vessels against an employer and does not differentiate between contractual or tort indemnity"). "[A] principal purpose [of the 1972 amendments] was to free maritime employers of indemnity claims by vessels on which their employees were injured, and thus to assure that an employer's compensation liability under the Act 'shall be exclusive and in place of all other liability' for an employment-related injury...The express legislative intent was to immunize employers of amphibious workers injured on a vessel from indemnity claims..." Boudreaux v. American

---

6 In Edmonds, the Supreme Court cited a Senate Report stating, "[i]t is the Committee's intention to prohibit such recovery under any theory including, without limitation, theories based on contract or tort." 443 U.S. at 270 n.28.

Workover, Inc., 680 F.2d 1034, 1052 (5th Cir. 1982).   Thus, it is well settled that "under the Act, the employer is immune to suit for indemnity or contribution by the vessel."   Samuels v. Empresa Lineas Maritimas Argentinas, 573 F.2d 884, 888 (5th Cir. 1978).

As such, if Brunson is a statutory employee, Flexicrew is a statutory employer, and Apex is a vessel, Apex's indemnity, defense and contribution claims against Flexicrew are prohibited, as a matter of law, under Section 905(b) the LHWCA, as Flexicrew is immune from said claims.

## A.     **Statutory Employee**

The LHWCA extends coverage to Brunson because he is a statutory "employee."   To be an employee and receive compensation under the LHWCA: 1) the person must be injured in the course of employment, 33 U.S.C. § 902(2); 2) the employer must have employees engaging in maritime employment, 33 U.S.C. § 902(4); 3) the injured person must have "status," that is, be engaged in maritime employment, 33 U.S.C. § 902(3);[7] and 4), the injury must occur "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel," 33 U.S.C. § 903(a)).   See, e.g.,

---

7  Section 902(3) provides as follows:

The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker, but such term does not include-- (A) individuals employed exclusively to perform office clerical, secretarial, security, or data processing work; (B) individuals employed by a club, camp, recreational operation, restaurant, museum, or retail outlet; (C) individuals employed by a marina and who are not engaged in construction, replacement, or expansion of such marina (except for routine maintenance); (D) individuals who (i) are employed by suppliers, transporters, or vendors, (ii) are temporarily doing business on the premises of an employer described in paragraph (4), and (iii) are not engaged in work normally performed by employees of that employer under this chapter; (E) aquaculture workers; (F) individuals employed to build any recreational vessel under sixty-five feet in length, or individuals employed to repair any recreational vessel, or to dismantle any part of a recreational vessel in connection with the repair of such vessel; (G) a master or member of a crew of any vessel; or (H) any person engaged by a master to load or unload or repair any small vessel under eighteen tons net; if individuals described in clauses (A) through (F) are subject to coverage under a State workers' compensation law.

Chesapeake and Ohio Ry. Co. v. Schwalb, 493 U.S. 40, 46 (1989).

Employee status "can be based upon the maritime nature of the employment as a whole" or on the maritime nature of the claimant's activity at the time of the injury."   Browning v. B.F. Diamond Const. Co., 676 F.2d 547, 548-549 (11th Cir. 1982) (citing Hullinghorst Indus., Inc. v. Carroll, 650 F.2d 750, 754 (5th Cir. 1981) and Thibodaux v. Atlantic Richfield Co., 580 F.2d 841, 844 (5th Cir. 1978)).   As set forth by Director v. Perini North River Assoc., 459 U.S. 297, 323-324 (1983) (footnote omitted): "when a worker is injured on the actual navigable waters in the course of his employment on those waters, he satisfies the status requirement in § 2(3),…providing, of course, that he is the employee of a statutory 'employer,' and is not excluded by any other provision of the Act. [ ] We consider these employees to be "engaged in maritime employment" not simply because they are injured in a historically maritime locale, but because they are required to perform their employment duties upon navigable waters."   See also e.g., Herb's Welding, Inc. v. Gray, 470 U.S. 414, 423 (1985) (discussing the expansion of the requirement that the LHWCA's prior application only to injuries sustained on the navigable waters of the United States, to now include large shoreside areas, necessitating an affirmative description of the particular employees working in those areas who would be covered – "[t]his was the function of the maritime employment requirement[]"); Brockington v. Certified Elec., Inc., 903 F.2d 1523, 1527 (11th Cir. 1990) (noting that the LHWCA was expanded to cover workers who are not actually physically on the water at the time of injury).

First, there is no dispute that Brunson was injured "in the course of his employment" and was not merely "transiently or fortuitously" on the barge.   Brunson was specifically hired to clean the barge and so was on the barge on the navigable waters (for about 29.5 hours over 3

10

days) when he received his alleged injuries (either topside as hole watch on down inside the tanks). (Doc. 179-2 (Dep. Brunson at 159-160, 285-286, 295-297, 299-300). Brunson was not merely taking the barge to and from his jobsite, but instead, the barge was his jobsite and where he spent almost all of his workday. Because almost all of Brunson's workday was spent "actually performing job responsibilities on navigable waters", on the barge, he was acting "in the course of his employment." See, e.g., Bienvenu v. Texaco, Inc., 164 F.3d 901, 906-908 (5th Cir. 1999) (footnote omitted) (stating that "[w]e believe that all *Perini* requires is that the claimant show that he was injured on navigable waters while in the course of his employment" and "[w]e therefore hold that a worker injured in the course of his employment on navigable waters is engaged in maritime employment and meets the status test [] only if his presence on the water at the time of injury was neither transient or fortuitous"); Perini, 459 U.S. at 324 (finding that "when a worker is injured on the actual navigable waters in the course of his employment on those waters, he satisfies the status requirement....").

Second, there is no dispute that Brunson's employer, Flexicrew, has employees engaging in maritime employment. Approximately 65% of Flexicrew's employees are employed in longshore positions such as working in shipyards, performing repair work on vessels and loading/unloading vessels. (Doc. 179-1 (Aff. March)).

Third, Brunson was engaged in maritime employment as defined in Section 902(3) at the time of his injuries because he was hired to assist in unloading the barge's cargo (rainwater/wastewater). See, e.g., Browning, 676 F.2d at 549-550 (finding that traditional longshoring activities such as unloading a vessel and handling (loading/unloading) cargo are maritime employment). Further, Brunson qualifies as a statutory employee under Section

11

902(3) due to being hired to clean the tanks on the barge. See, e.g., Hite v. Maritime Overseas Corp., 375 F. Supp. 233, 235 (E.D. Tex. 1974) (holding that an employee of land-based employer engaged in cleaning rust from walls of a cargo tank of a vessel undergoing changeover from hauling of petroleum products to transportation of wheat was engaged in work in the nature of shipbuilding or ship repairing and therefore was "employee" under the LHWCA); Perez v. Marine Transp. Lines, Inc., 160 F. Supp. 853, 854 (E.D. La. 1958) (finding that where a seaman was hired not to serve as a regular crew on the vessel but to clean the vessel's tanks under supervision of ship's officers and with ship's equipment, he was not a member of the crew and his exclusive remedy was under the LHWCA).

Fourth, the parties do not dispute that Brunson was working on a barge located on the navigable waters of the United States – the Theodore Industrial Canal – when he was allegedly injured. (Doc. 179 at 12; Doc. 175 at 1; Doc. 179-2 (Dep. Brunson at 287)). At all pertinent times, the barge was actually in the water. (Doc. 179-2 (Dep. Brunson at 287)).

## B.    Statutory Employer

The LHWCA extends coverage to Flexicrew because it is a statutory employer under 902(4).[8]   As defined in Section 902(4), a statutory "employer" is "an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (as described in 33 U.S.C. s 903(a))."   As noted *supra*, 65% of Flexicrew's employees are employed in longshore positions upon the navigable waters of the United States. (Doc. 179-1 (Aff. March)).   Additionally, when an injured worker meets the employee

---

8 Section 902(4) provides: "The term 'employer' means an employer any of whose employees are employed in maritime employment, in whole or in part, upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, or building a vessel)."

definition, his employer automatically qualifies as a statutory employer under Section 902(4). See, e.g., Hullinghorst Indus., Inc. v. Carroll, 650 F.2d 750, 758 (5th Cir. 1981).[9]

**C.      Whether Apex is a Vessel**

Flexicrew's motion for summary judgment as to Apex's claims against it are premised on Apex's presumed status as a "vessel" for purposes of the LHWCA, 33 U.S.C. § 905(b). However, Apex's vessel status has not yet been determined.   Upon consideration, the Court now concludes that Apex is a "vessel" as a matter of law.

Section 905(b) of the LHWCA provides a right of action to longshoremen injured due to negligence of a vessel.   The LHWCA defines "vessel" broadly: "[u]nless the context requires otherwise, **the term 'vessel' means** any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and **said vessel's** owner, **owner pro hac vice,** agent, operator, **charter or bare boat charterer,** master, officer, or crew member." 33 U.S.C. § 902(21) (emphasis added). See also Stewart v. Dutra Const. Co., 543 U.S. 481 (2005) (providing that Section 902(21) "lists the parties liable for the negligent operation of a vessel[[]"); Mallard v. Aluminum Co. of Canada, Ltd., 634 F.2d 236, 242 n. 5 (5th Cir. 1981) (discussing liability of time charterer).

Natures Way is the owner of the barge (vessel) and Apex is the charterer of the barge (vessel).   This is not disputed and is clear from the Natures Way-Apex charter agreement. (Doc. 179-4).   To skirt being deemed a "vessel," Apex claims it is "simply the adjoining premises owner[]" (Doc. 201 at 21-24), and endeavors to characterize itself as a time charter (versus a demise/bareboat charterer) with no responsibility or control over the barge, as there are

---

9  The Eleventh Circuit has adopted as precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.   Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

different liability consequences for these types of charters under Section 905(b).[10]   However, Apex's characterization ignores its charter status and the LHWCA's clear definition of vessels which specifically includes a "charter."    See, e.g., Helaire v. Mobil Oil Co., 709 F.2d 1031 (5th Cir. 1983) (finding owner and charter are vessels); Butcher v. Dravo Corp., 2009 WL 799746 (W.D. Pa. 2009) (same); M-I L.L.C v. Masse Contracting, Inc., 2008 WL 754849 (E.D. La. 2008) (same); Sea Calm Shipping Co., S.A. v. Cooks, 565 So.2d 212, 215 (Ala. 1990) (same). While charter or bare boat charterer is expressly mentioned in Section 902(21), and "time charterer" is not, courts have held that a time charterer is likewise amenable to suit under Section 905(b). See, e.g., Hendricks v. Earling Shipping Co., Ltd., 1998 WL 684206 (S.D. Ga. May 4, 1998).

The rule in the Eleventh Circuit is that "[a] time charterer who has no control over a vessel assumes no liability for negligence of the crew or unseaworthiness of the vessel absent an agreement to the contrary."   Hayes v. Wilh Wilhelmsen Enters., Ltd., 818 F.2d 1557, 1559 (11th Cir. 1987) (citing Mallard, 634 F.2d at 242 n. 5) (emphasis added).[11]   As such, this Court must determine whether Apex had control over the vessel.

There are essentially two types of charters: a voyage/time charter, and a bareboat/demise

_____

10 Additionally, Apex previously contended that it satisfies the exception under 902(21), as this case "requires a finding otherwise" that it is not a vessel, because it is "simply the adjoining premises owner[]" and it "defies common sense to convert a premises owner into a vessel[.]"   (Doc. 201 at 23).   See also Doc. 216 at 14-17.   However, a premises liability claim is not before the Court as Brunson did not allege as such against Apex. As such, this "finding otherwise" argument is irrelevant to the claims at issue in this case.

11 While the Eleventh Circuit has cast some doubt on the continued validity of this rule, it has stopped short of overruling it. Id. at 1559 n. 1 (stating "it is unclear whether the holding of D/S Ove Skou is still good law and binding precedent in this circuit. The 1972 amendments, which afford an injured longshoreman a right of action against a charterer for negligence, undercuts the rationale of D/S Ove Skou v. Hebert. At an appropriate time, the en banc court must address the continued vitality of that case[]"). "The law of this circuit is 'emphatic' that only the Supreme Court or this court sitting en banc can judicially overrule a prior panel decision." Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997). "Because the Eleventh Circuit in Hayes applied the existing rule in the face of the 1972 amendments to the LHWCA, this Court is bound by that decision."   Berry v. Mi-Das Line SA, 2009 WL 3112028 (S.D. Ga. Sept. 28, 2009).

charter.  See, e.g., Walker v. Braus, 995 F.2d 77 (5th Cir. 1993) (explaining the difference as being "[i]n a time charter the vessel owner retains possession and control of the vessel…provides whatever crew is needed and is responsible for normal operating expenses…the owner fully equips and maintains the vessel, makes repairs as needed and provides insurance on the vessel[]" but "[u]nder a bareboat or demise charter…the full possession and control of the vessel is transferred to the charterer…the vessel is transferred without crew, provisions, fuel or supplies, i.e. 'bareboat'[] and when, and if, the charterer operates the vessel he must supply also such essential operating expenses. Because the charter's personnel operate and man the vessel during a demise charter, the charterer has liability for any and all casualties resulting from such operation and therefore provides insurance for such liability[]").   With the typical time charter, the vessel remains under the possession and control of the vessel's owners; however, with a bareboat or demise charter, full or complete possession and control of a vessel is transferred to a charterer for the duration specified in the charter contract (thus, full control of the vessel for a certain period of time, controlling its schedule, crew, navigation, etc., is the primary character of this type of charterer).  Id.

A vessel charter need not be in writing to constitute a bareboat charter; control is the critical issue to determine whether such a charter exists. See, e.g., McAleer v. Smith, 57 F.3d 109, 112-113 (1st Cir. 1995) (explaining the demise/bareboat charter is a type of owner pro hac vice status – "[a] demise charterer is 'one who contracts for the vessel itself and assumes exclusive possession, control, command and navigation thereof for a specified period[]'"); U.S. v. West Indies Transport Co., Inc., 57 F.Supp.2d 198 (D.V.I. 1999) (describing the difference between charters – "[a] demise [or bare boat] charterer is 'one who contracts for the vessel itself

15

and assumes exclusive possession, control, command and navigation thereof for a specified period'…in contrast to a time or voyage charterer who 'contracts not for the vessel itself but for a specific service of the vessel, such as carriage of goods, which is rendered by the owner's master and crew[]'"); Walker v. Braus, 861 F. Supp. 527, 530 (E.D. La. 1994) (discussing the nature of a demise or bareboat charter – "the vessel is transferred to the charterer without crew, fuel, or supplies. Because the charterer's personnel operate and man the vessel while the charter is in existence, the charterer is responsible for the negligence of the vessel or its crew[]").

The September 6, 2011 Natures Way-Apex Charter Agreement (Doc. 179-4) does not include any provisions specifying for Apex, as charterer, to have or not have control over the barge or its crew during the charter period. The charter agreement is silent in that regard.[12] However, the charter does require Apex to clean the barge tanks before returning the vessel to Natures Way. Additionally, facts surrounding the resulting division of responsibility, as between Natures Way and Apex, clearly show that Natures Way turned the barge completely over to Apex when the charter commenced and relinquished all of its control when doing so. While docked in the navigable waters on the Theodore Industrial Canal, there is no evidence to contradict that Apex had 100% control over the barge, the crew, the loading/unloading of the rain/wastewater cargo, etc. The evidence indicates that Natures Way did not have any involvement with Apex and/or the barge -- until it retrieved the barge at the conclusion of the charter. Indeed, according to Natures Way, once Apex chartered the barge on September 6th,

---

12 The Court is aware of the rule in the Eleventh Circuit that "[a] time charterer who has no control over a vessel assumes no liability for negligence of the crew or unseaworthiness of the vessel absent an agreement to the contrary." Hayes v. Wilh Wilhelmsen Enters., Ltd., 818 F.2d 1557, 1559 (11th Cir. 1987). See also Mallard v. Aluminum Co. of Can., Ltd., 634 F.2d 236, 242 n. 5 (5th Cir. 1981); Kerr-McGee Corp. v. Ma-Ju Marine Servs., Inc., 830 F.2d 1332, 1343 (5th Cir. 1987). However, these cases are distinguishable as they *presuppose* a time charterer with *no* control over a vessel. Here, the actions of Apex make clear that it, as the charter, had 100% control over the barge.

Natures Way relinquished control of the barge to Apex (no crew were assigned by Natures Way and all care, custody and control of the barge rested with Apex), and Natures Way only later returned to the barge, after the completion of the charter period, to inspect it. (Doc. 242-2 (Dep. J.Spencer at 15-17); Doc. 242-7 (Dep. G.Hayes at 27, 30-31)). Natures Way asserts and Apex has not contradicted, that at no point did any of its employees/agents have operation/control over the barge while under charter with Apex. (Doc. 242-2 (Dep. J.Spencer at 16)). Thus, Apex had the right to use the barge for its own purposes and Apex assumed responsibility for the command and operation of the barge (including movement of cargo).

These facts support a finding that Apex had control of the vessel and -- through its actions -- assumed the rights and obligations of the owner during the charter, such that Apex is, as a matter of law, the "vessel" during the relevant timeframe (the days Brunson was allegedly injured).

**D.    Section 905(b) & Apex's Indemnity and Contribution Claims**

Section 905(b) of the LHWCA expressly prohibits indemnity and contribution claims whether made "directly or indirectly" and "any agreements or warranties to the contrary shall be void." Courts in the Eleventh Circuit universally dismiss indemnity and contribution claims made by vessels, such as Apex, against employers, such as Flexicrew, regardless of whether the claims seek damages directly or indirectly in contract or tort.[13]  See, e.g., Smith v. United States, 980 F.2d 1379, 1381 (11th Cir. 1993) (providing that although 33 U.S.C. § 905(a) has been interpreted by the Eleventh Circuit as not barring contract indemnity actions, § 905(b) explicitly prohibits indemnity action by vessels against an employer and does not differentiate between

_____

13  Also, employers cannot even indemnify non-vessels through a contractual waiver where the proceeds would indirectly indemnify a vessel.   See, e.g., M-I L.L.C., 2008 WL 754849 at *5; Gaudet v. J.Ray McDermott & Co., Inc., 568 F. Supp. 795, 798 (E.D. La. 1983).

contractual or tort indemnity); <u>Knudsen</u>, 710 F. Supp.2d at 1368 at note 9 (same).   As such, Apex's indemnity claim is prohibited.

Further, Apex contends that Flexicrew waived its LHWCA immunity per the terms of the August 13, 2010 labor staffing contract with USES.[14]   As stated, Section 905(b) specifies that an employer cannot waive immunity by any agreements or warranties to support a contrary result.

### E.    Flexicrew retains Section 905(a) immunity as it "Secured Payment"

Apex contends that Flexicrew's denial of Brunson's claim destroys immunity. Specifically, Apex argues that the maintenance of insurance coverage is insufficient to satisfy the Section 905(a) requirement to "secure payment" of compensation and that Flexicrew must pay Brunson's claim in order to be immune.   Flexicrew asserts that it is immune from Apex's claims because it is a statutory employer which "secured payment" as required by the statute by maintaining insurance (United States Longshore and Harbor Workers Act ("USL&H") insurance coverage).   (Doc. 179-1 at 2 (Aff. March at 2)).

Relying on case law from other circuits, Apex mischaracterizes the clear language of the statute and overlooks precedent.   The LHWCA provides that the employer must secure payment of compensation, and binding case law explains this as the long-range method whereby the employer satisfies the Department of Labor that it can, that is, *it has the potential*, to pay compensation payments when/if required to do so under the Act.   The LHWCA does not place

---

14    Apex cites <u>Tran v. Manitowoc Eng. Co.</u>, for the proposition that LHWCA employer immunity may be waived by an indemnity contract with a third party other than the vessel owner.   (Doc. 201 at 20).   <u>Tran v. Manitowoc Eng. Co.</u>, 767 F.2d 223, 226-227 (5th Cir. 1985) held that "[i]f the vessel owner and the…employer are the same entity…the injured employee may still bring an action to recover damages-but only for vessel owner negligence, not for stevedoring negligence."   Apex overlooks the key distinguishing facts of that case – namely, that the employer (Becker) was also the vessel owner.   Here, Flexicrew is only the employer, not also the vessel owner, such that this case is inapposite.

any additional burden on the employer to immediately and actually make compensation payments to individual injured employees.   In other words, Flexicrew must "*secure*" payment, not actually *make* payment of benefits.

Specifically, in <u>Thibodeaux v. J. Ray McDermott & Co</u>., 276 F.2d 42 (5th Cir. 1960),[15] a welder fell to his death while working on an unmanned barge.   His relatives sued his employer seeking damages and asserted, in part, that the employer was liable for failing to secure payment under the LHWCA.   The Fifth Circuit explained the meaning of "secure payment:"

> …On the theory that the Employer failed 'to secure payment of compensation,' the plaintiffs exercised their statutory election provided in § 905 of the Longshoremen's Act to sue 'for damages on account of such injury or death.'
>
> The District Court held that this claim for damages was unfounded since the record demonstrated conclusively that the Employer had secured payment of compensation. We agree.
>
> * * *
>
> …By the structure of the Act, *the reference in § 905 to an employer who 'fails to secure payment of compensation as required by this chapter' relates to the specific provision in 932 which prescribes how and in what manner an employer shall comply with the obligation to secure payment of compensation.*FN5
>
> > *FN5*. 33 U.S.C.A. § 932 reads: '(a) Every employer shall secure the payment of compensation under this chapter (1) By insuring ***: or (2) (By securing approval as a self insurer) to pay such compensation directly ***.'

<u>Thibodeaux</u>, 276 F.2d at 46 (emphasis added). Section 932 provides, in relevant part, that: "[e]very employer shall secure the payment of compensation under this chapter - (1) By insuring and keeping insured the payment of such compensation with any stock company or mutual fund company or association, or with any other person or fund, while such person or fund is authorized (A) under the laws of the United States or of any State, to insure workmen's compensation, and (B) by the Secretary, to insure payment of compensation under this

---

15  The Eleventh Circuit has adopted as precedent all of the decisions of the former Fifth Circuit decided prior to October 1, 1981.   <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

chapter…" 33 U.S.C.A. § 932. As explained in <u>Jefferson v. S.S. BONNY TIDE</u>, 281 F. Supp. 884, 885-886 (E.D. La. 1968) (emphasis added):

> …Clearly, the reference in § 5 to an employer's failure to 'secure payment' relates to the long-range method whereby the employer satisfies the Department of Labor that it can, that is, it has the potential, to pay compensation payments when and if required to do so under the Compensation Act. *The language of § 5 does not place any additional burden on the employer who has secured his ability to discharge his burden under the Act to immediately and actually make compensation payments to individual injured employees* at the risk*, if he fails to do so, of creating an election in the employee to maintain an action at law or in admiralty. The Act clearly and specifically permits the employer to contest liability for compensation* by following certain procedures designed to insure a speedy determination by the Deputy Commissioner of any issues raised. 33 U.S.C. § 914(a), (d), (h), and (i).

Additionally, in <u>Reichert v. Chemical Carriers, Inc.</u>, 794 F.2d 1557, 1559 (11th Cir. 1986), the Eleventh Circuit stated that Congress provided that an employer which provides compensation coverage may not be sued. Binding case law also indicates that an employer's payment of insurance premiums have been found to cover compensation liability. <u>See</u>, <u>e.g.</u>, <u>Johnson v. American Mut. Liab. Ins. Co.</u>, 559 F.2d 382, 392 (5th Cir. 1977) (finding that "[t]he quid pro quo expected from the employer in return for the grant of immunity from tort liability is, in the case of the self-insurer, the payment of compensation, and in the case of the insured employer, the payment of insurance premiums adequate to cover compensation liability not the payment of insurance premiums adequate to cover unlimited tort liability, either of the employer or of the compensation insurer[]"). Other courts have also stated that when an employer maintains insurance coverage, the employer is entitled to LHWCA immunity. <u>See, e.g.</u>, <u>Martin v. Halliburton</u>, 808 F.Supp.2d 983, 990 (S.D. Tex. 2011) (stating that under the Act "an employer has secured payment of compensation if the employer obtained insurance on the payment of compensation…Defendants had the requisite insurance. Therefore, Defendants

secured payment of compensation[]"); Colon Colon v. United States Dep't of Navy, 223 F. Supp.2d 368, 370 (D.P.R. 2002) (providing that courts "have uniformly held that an employer that secures insurance coverage for its employees…is entitled to immunity under the LHWCA[]").

Here, Flexicrew's securing of insurance with USL&H amounts to "securing payment" of compensation under the LHWCA. The fact that USL&H, Flexicrew's insurance carrier, has contested Brunson's claim to benefits under the LHWCA does not mean that Flexicrew failed to secure compensation under the Act. Because Flexicrew discharged its statutory obligation for compensating Brunson by maintaining insurance coverage through an insurance carrier, Flexicrew retains its immunity under the LHWCA.

## VI. Conclusion

Accordingly, based on the foregoing, it is **ORDERED** that Flexicrew's Motion for Summary Judgment (Docs. 178-180) is **MOOT** as to Natures Way's claims against it and **GRANTED** as to Apex's claims against it. It is further **ORDERED** that USES' Motion for Summary Judgment (Docs. 190-192) is **MOOT** as to Natures Way's claims against it and **DENIED at this time as to** Apex's claim against it.[16]

**DONE** and **ORDERED** this the **25th** day of **November 2013.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**

---

16 Apex's claim against USES for contractual indemnity will be merged with 12-651 for trial. The proposed pre-trial order in 12-651 should reflect this merger.

21