**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| IN THE MATTER OF THE COMPLAINT | ) | |
| OF NATURES WAY MARINE, LLC, | ) | |
| *Owner of the Tank Barge NWM 431 or AO 431* | ) | CIVIL ACTION NO. 12-00390-KD-N |
| *(Hull No. D 557753) for Exoneration from or* | ) | |
| *Limitation of Liability* | ) | |

**ORDER**

This matter is before the Court on a review of Apex, LLC's, d/b/a FCC Oilfield Services ("Apex")'s [Partial] Motion for Summary Judgment (Docs. 244-246), Plaintiff Charles Brunson ("Brunson")'s Response (Docs. 261-262), and Apex's Reply (Doc. 270).[1]

**I.   Background**

A personal injury lawsuit filed by temporary laborer Charles Brunson ("Brunson"), regarding his alleged exposure to toxic chemicals while cleaning a barge on the Theodore Industrial Canal in Mobile County, Alabama, spawned a number of claims, cross-claims, and counter-claims among five (5) parties. As a result of this litigation, Brunson filed a claim against Apex, alleging breach of its turnover duty under Section 905(b) (Count Two), negligence (Count Three), and wantonness. (Doc. 50).

The relevant factual background is as follows. On August 19, 2010, Natures Way purchased a barge.[2] (Doc. 242-1). Natures Way then hired U.S. Environmental Services, LLC ("USES")[3] to clean the barge. (Doc. 242-2 (Dep. J.Spencer at 10-11); Doc. 242-3 (Dep.

---

   1 Apex does not move for summary judgment on Brunson's wantonness claim against it (Doc. 50 at 9-10). Apex addresses this in the Reply, asserting it is subsumed with ordinary negligence (Doc. 270).

   2 Tank Barge NWM 431 or AO 431-Hull NO. D 557753.

   3 USES is a company that provides environmental, industrial, and marine cleaning and safety

1

W.Blackmon at 22-24)).

On August 25, 2011, marine chemist Tom Littlepage ("Littlepage") inspected the barge by boarding, visually observing, and chemically testing the barge and its tanks for dangerous conditions (*i.e.*, conducted the chemical certification process of the barge). (Doc. 242-5 (Aff. T.Littlepage)). In so doing, Littlepage observed small amounts of "bunker residue" in the barge's cargo tanks 1, 2, and 3, but determined that the residue did not render the barge or its tanks unsafe for work: "[i]f the residue had been in such a state or quantity to be unsafe for workers, that would have been noted on the Certificate." (Id. at 2 (Aff. Littlepage at ¶8)). Additionally, Littlepage tested the barge tanks for impermissible concentrations of oxygen, flammable gas and toxic materials; he did not detect any hazardous conditions or toxic chemicals on the barge or its tanks that would have rendered the atmosphere dangerous to workers. (Id.) Littlepage designated the atmosphere as "safe for workers" on the corresponding marine certificate.[4] (Doc. 242-4 (Certificate)). Moreover, Littlepage concluded that the barge was typical of a "No. 6 Oil Barge" and that its conditions did not present a danger to those individuals coming aboard. (Doc. 242-4 (Certificate); Doc. 242-5 (Aff. Littlepage)). Thus, as of August 25, 2011, the barge was certified as being clean and gas free by Littlepage via issuance of Marine Chemist Certificate Serial No #063740. (Doc. 242-4 (Certificate); Doc. 242-2 at 3, 5 (Dep. J.Spencer at 10, 15)). Littlepage added that the certificate would be void if "anything was placed in the tanks after my inspection[]" because "[a]ny change in conditions (e.g., placing of cargo of any sort in the tank barge) would require re-evaluation and issuing of another

---

services to a broad range of customers, including maritime customers. (Doc. 191-1 (Aff. T.Bayham)).

    4 In the event Littlepage had discovered unsafe conditions, he would have noted same on the marine certificate as "enter with restrictions" or "not safe for workers." (Doc. 242-5 (Aff. T.Littlepage)). Littlepage made no such notations. (Doc. 242-4).

Certificate." (Aff. T.Littlepage at ¶9)).

On September 6, 2011, barge owner Natures Way Marine, LLC ("Natures Way") executed a charter agreement with Apex; Natures Way was the owner and Apex was the charterer. (Doc. 179-4). Apex planned to use the barge to transport "rainwater/wastewater" cargo. (Id.) Pursuant to this charter agreement, Natures Way agreed to deliver possession of the barge to Apex at Apex terminal, and both parties agreed that the cargo to be carried would be rainwater/wastewater. (Id.) Additional conditions included that Apex would return the barge in a "gas free" and clean condition, and that the agreement would be governed by general maritime law with venue in the Southern District of Alabama. (Id.) On September 6, 2011, Apex took delivery of the barge. According to Apex employee Brian Haas, when the barge was delivered to Apex by Natures Way it was clean and he did not smell anything out of the ordinary. (Doc. 242-6 at 5-7 (Dep. B.Haas at 20-22)).

During the charter, Apex used the barge's tanks to temporarily store rainwater/wastewater which had collected on Apex's premises from Tropical Storm Lee. (Doc. 242-7 at 5 (Dep. G.Hayes at 31)). Apex then pumped it back out into the Apex system for processed water. (Id.) Before the charter was complete, and after Apex transferred the rainwater/wastewater from its facility to the barge tanks, Apex hired USES[5] to remove the rainwater and clean the barge and its tanks. (Doc. 242-3 at 3-5 (Dep. W.Blackmon at 22-24)).

From September 26-29, 2011, USES performed the work of removing and offloading rainwater from the barge and cleaning the barge by having three (3) workers pressure wash the interior of its tanks and pump out excess rainwater. (Docs. 1, 50, 59; Doc. 242-3 at 6-7 (Dep.

---

[5] Apex was required, as a condition of the charter agreement with Natures Way, to employ the services of a third party. (Doc. 179-4).

W.Blackmon at 52-53)). Pursuant to a previously executed August 13, 2010 contractual agreement for temporary labor between USES and Flexicrew Staffing, Inc. ("Flexicrew")[6] (Doc. 201-1), USES hired Flexicrew to provide two (2) additional workers to clean the barge's tanks. (Doc. 187-3 at 1-7; Doc. 242-3 at 6-7 (Dep. W.Blackmon at 52-53)). Natures Way was not present (via agent or employee) during the cleaning operation. (Doc. 242-2 (Dep. J.Spencer at 16)).

Brunson, hired earlier by Flexicrew on September 4, 2011, was one of the individuals assigned to clean the barge's tanks. (Docs. 1, 50, 59; 179-2 at 5 (Dep. Brunson at 131)). Brunson's duties included performing safety work as "hold watch" on the barge's topside, and wiping down the stairs leading into the body of the tanks in the barge. (Doc. 179-2 at 8, 19-23 (Dep. Brunson at 160, 296-300)). Brunson cleaned the tanks until September 29, 2011. (Doc. 50; Doc. 179-2 at 18-19 (Dep. Brunson at 295-296); Doc. 258-4 at 6-9 (Dep. M.Lomas at 18-20, 22)). Brunson cleaned the tanks, located on the Theodore Industrial Canal, for about 29.5 hours over 3 days. (Docs. 1, 50; Doc. 179-2 at 14-20 (Dep. Brunson at 284-287, 295-297)). Thereafter; he reported that he was suffering hair loss, skin irritation, nausea, and vomiting. (Id.) As alleged, on October 7, 2011, Brunson sought medical treatment and was diagnosed with chemical exposure injuries including permanent injuries. (Docs. 1, 50). Brunson underwent surgery, the insertion of a J-tube, was placed on a liquid diet, and continues to suffer from the effects of the alleged exposure. (Id.)

Natures Way employees boarded the barge at the end of September 2011 to inspect it to make sure it complied with the charter with Apex – that the barge was gas free and had been

---

[6] Flexicrew is a staffing company which provides temporary skilled/unskilled laborers to other businesses; Brunson was one of its employees. (Doc. 187-4 at 3, 5 (Dep. A.March at 11, 13)).

cleaned. (Doc. 242-2 at 6-7 (Dep. J.Spencer at 16-17)). Apex was satisfied with the cleaning work that USES performed. (Doc. 242-7 at 6 (Dep. G.Hayes at 50)).

In 2011, Brunson filed a compensation claim under the *Longshore and Harbor Workers' Compensation Act* ("LHWCA"), 33 U.S.C. § 901 *et seq*., against Flexicrew. On December 27, 2011, Flexicrew's insurance carrier denied Brunson's claims. (Doc. 200-4). To date, Flexicrew has not paid any LHWCA benefits to Brunson.

## II. Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (Dec. 2010). Rule 56(c) provides as follows:

> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> *(2) Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> *(3) Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.
>
> *(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c) (Dec. 2010). The party seeking summary judgment bears the "initial

responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992) (internal citations and quotations omitted).

## III. Discussion

Apex moves for summary judgment on Brunson's claims against it for Section 905(b) negligence based on breach of its LHWCA turnover duty,[7] and for general negligence. (Doc. 50 at 6-8). Apex asserts that it did not breach any duties potentially owed to Brunson under the LHWCA, that his negligence claim is subsumed under maritime law (and/or in the alternative, it was not negligent), and that Brunson cannot produce sufficient evidence to show causation which is required for a negligence claim. (Docs. 244-246).

---

[7] While Apex briefed the second and third Scindia duties (Doc. 245 at 12-13), Brunson did not allege "active operations" or "duty to intervene" in his Verified Complaint; thus, these duties are not at issue in this case.

A.      **Apex's Vessel Status**

Apex's motion for summary judgment as to Brunson's claims against it are premised on Apex's presumed status as a "vessel" for purposes of the LHWCA, 33 U.S.C. § 905(b).

Section 905(b) of the LHWCA provides a right of action to longshoremen injured due to negligence of a vessel. The LHWCA defines "vessel" broadly: "[u]nless the context requires otherwise**, the term 'vessel' means** any vessel upon which or in connection with which any person entitled to benefits under this chapter suffers injury or death arising out of or in the course of his employment, and **said vessel's** owner, **owner pro hac vice,** agent, operator, **charter or bare boat charterer,** master, officer, or crew member." 33 U.S.C. § 902(21) (emphasis added). See also Stewart v. Dutra Const. Co., 543 U.S. 481 (2005) (providing that Section 902(21) "lists the parties liable for the negligent operation of a vessel[[]"); Mallard v. Aluminum Co. of Canada, Ltd., 634 F.2d 236, 242 n. 5 (5th Cir. 1981) (discussing liability of time charter).

Natures Way is the owner of the barge (vessel) and Apex is the charterer of the barge (vessel). This is not disputed and is clear from the Natures Way-Apex charter agreement. (Doc. 179-4). To skirt being deemed a "vessel," Apex claims it is "simply the adjoining premises owner[]" (Doc. 201 at 21-24), and endeavors to characterize itself as a time charter (versus a demise/bareboat charterer) with no responsibility or control over the barge, as there are different liability consequences for these types of charters under Section 905(b).[8]  However, Apex's characterization ignores its charter status and the LHWCA's clear definition of vessels which specifically includes a "charter."   See, e.g., Helaire v. Mobil Oil Co., 709 F.2d 1031 (5th

---

[8] Additionally, Apex previously contended that it satisfies the exception under 902(21), as this case "requires a finding otherwise" that it is not a vessel, because it is "simply the adjoining premises owner[]" and it "defies common sense to convert a premises owner into a vessel[.]"   (Doc. 201 at 23).   See also Doc. 216 at 14-17.   However, a premises liability claim is not before the Court as Brunson did not allege as such against Apex. As such, this "finding otherwise" argument is irrelevant to the claims at issue in this case.

Cir. 1983) (finding owner and charter are vessels); Butcher v. Dravo Corp., 2009 WL 799746 (W.D. Pa. 2009) (same); M-I L.L.C v. Masse Contracting, Inc., 2008 WL 754849 (E.D. La. 2008) (same); Sea Calm Shipping Co., S.A. v. Cooks, 565 So.2d 212, 215 (Ala. 1990) (same). While charter or bare boat charterer is expressly mentioned in Section 902(21), and "time charterer" is not, courts have held that a time charterer is likewise amenable to suit under Section 905(b). See, e.g., Hendricks v. Earling Shipping Co., Ltd., 1998 WL 684206 (S.D. Ga. May 4, 1998).

The rule in the Eleventh Circuit is that "[a] time charterer who has no control over a vessel assumes no liability for negligence of the crew or unseaworthiness of the vessel absent an agreement to the contrary." Hayes v. Wilh Wilhelmsen Enters., Ltd., 818 F.2d 1557, 1559 (11th Cir. 1987) (citing Mallard, 634 F.2d at 242 n. 5) (emphasis added).[9] As such, this Court must determine whether Apex had control over the vessel.

There are essentially two types of charters a voyage/time charter, and a bareboat/demise charter. See, e.g., Walker v. Braus, 995 F.2d 77 (5th Cir. 1993) (explaining the difference as being "[i]n a time charter the vessel owner retains possession and control of the vessel…provides whatever crew is needed and is responsible for normal operating expenses…the owner fully equips and maintains the vessel, makes repairs as needed and provides insurance on the vessel[]" but "[u]nder a bareboat or demise charter…the full possession and control of the vessel is

---

9 While the Eleventh Circuit has cast some doubt on the continued validity of this rule, it has stopped short of overruling it. Id. at 1559 n. 1 (stating "it is unclear whether the holding of *D/S Ove Skou* is still good law and binding precedent in this circuit. The 1972 amendments, which afford an injured longshoreman a right of action against a charterer for negligence, undercuts the rationale of *D/S Ove Skou v. Hebert*. At an appropriate time, the en banc court must address the continued vitality of that case[]"). "The law of this circuit is 'emphatic' that only the Supreme Court or this court sitting en banc can judicially overrule a prior panel decision." Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997). "Because the Eleventh Circuit in *Hayes* applied the existing rule in the face of the 1972 amendments to the LHWCA, this Court is bound by that decision." Berry v. Mi-Das Line SA, 2009 WL 3112028 (S.D. Ga. Sept. 28, 2009).

transferred to the charterer…the vessel is transferred without crew, provisions, fuel or supplies, i.e. 'bareboat'[] and when, and if, the charterer operates the vessel he must supply also such essential operating expenses. Because the charter's personnel operate and man the vessel during a demise charter, the charterer has liability for any and all casualties resulting from such operation and therefore provides insurance for such liability[]"). With the typical time charter, the vessel remains under the possession and control of the vessel's owners; however, with a bareboat or demise charter, full or complete possession and control of a vessel is transferred to a charterer for the duration specified in the charter contract (thus, full control of the vessel for a certain period of time, controlling its schedule, crew, navigation, etc., is the primary character of this type of charterer). Id.

A vessel charter need not be in writing to constitute a bareboat charter; control is the critical issue to determine whether such a charter exists. See, e.g., McAleer v. Smith, 57 F.3d 109, 112-113 (1st Cir. 1995) (explaining the demise/bareboat charter is a type of owner pro hac vice status – "[a] demise charterer is 'one who contracts for the vessel itself and assumes exclusive possession, control, command and navigation thereof for a specified period[]'"); U.S. v. West Indies Transport Co., Inc., 57 F.Supp.2d 198 (D.V.I. 1999) (describing the difference between charters – "[a] demise [or bare boat] charterer is 'one who contracts for the vessel itself and assumes exclusive possession, control, command and navigation thereof for a specified period'…in contrast to a time or voyage charterer who 'contracts not for the vessel itself but for a specific service of the vessel, such as carriage of goods, which is rendered by the owner's master and crew[]'"); Walker v. Braus, 861 F. Supp. 527, 530 (E.D. La. 1994) (discussing the nature of a demise or bareboat charter – "the vessel is transferred to the charterer without crew,

9

fuel, or supplies. Because the charterer's personnel operate and man the vessel while the charter is in existence, the charterer is responsible for the negligence of the vessel or its crew[]").

The September 6, 2011 Natures Way-Apex Charter Agreement (Doc. 179-4) does not include any provisions specifying for Apex, as charterer, to have or not have control over the barge or its crew during the charter period. The charter agreement is silent in that regard.[10] However, the charter does require Apex to clean the barge tanks before returning the vessel to Natures Way. Additionally, facts surrounding the resulting division of responsibility, as between Natures Way and Apex, clearly show that Natures Way turned the barge completely over to Apex when the charter commenced and relinquished all of its control when doing so. While docked in the navigable waters on the Theodore Industrial Canal, there is no evidence to contradict that Apex had 100% control over the barge, the crew, the loading/unloading of the rain/wastewater cargo, etc. The evidence indicates that Natures Way did not have any involvement with Apex and/or the barge -- until it retrieved the barge at the conclusion of the charter. Indeed, according to Natures Way, once Apex chartered the barge on September 6th, Natures Way relinquished control of the barge to Apex (no crew were assigned by Natures Way and all care, custody and control of the barge rested with Apex), and Natures Way only later returned to the barge, after the completion of the charter period, to inspect it. (Doc. 242-2 (Dep. J.Spencer at 15-17); Doc. 242-7 (Dep. G.Hayes at 27, 30-31)). Natures Way asserts and Apex has not contradicted, that at no point did any of its employees/agents have operation/control over

---

[10] The Court is aware of the rule in the Eleventh Circuit is that "[a] time charterer who has no control over a vessel assumes no liability for negligence of the crew or unseaworthiness of the vessel absent an agreement to the contrary." Hayes v. Wilh Wilhelmsen Enters., Ltd., 818 F.2d 1557, 1559 (11th Cir. 1987). See also Mallard v. Aluminum Co. of Can., Ltd., 634 F.2d 236, 242 n. 5 (5th Cir. 1981); Kerr-McGee Corp. v. Ma-Ju Marine Servs., Inc., 830 F.2d 1332, 1343 (5th Cir. 1987). However, these cases are distinguishable as they *presuppose* a time charterer with *no* control over a vessel. Here, the actions of Apex make clear that it, as the charter, had 100% control over the barge.

the barge while under charter with Apex. (Doc. 242-2 (Dep. J.Spencer at 16)). Thus, Apex had the right to use the barge for its own purposes and Apex assumed responsibility for the command and operation of the barge (including movement of cargo).

These facts support only a finding that Apex had control of the vessel and -- through its actions -- assumed the rights and obligations of the owner during the charter, such that Apex is, as a matter of law, the "vessel" during the relevant timeframe (the days Brunson was allegedly injured).

**B.     LHWCA's Section 905(b) & Breach of Turnover Duty**

The LHWCA establishes a comprehensive federal workers' compensation program that provides covered employees and their families with medical, disability, and survivor benefits for work-related injuries and death. Howlett v. Birkdale Shipping Co., 512 U.S. 92, 96 (1994). In addition Section 905(b) of the LHWCA provides, in relevant part, that a covered employee may sue the vessel for his injuries, if his injury was caused by the negligence of a vessel:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer….The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

See also Curry, 2006 WL 517650, *2. Thus, vessels are liable for negligence to maritime

employees who are injured while on the vessel.

Brunson contends that Apex, as the vessel, breached its "turnover duty" to him, as an employee, by failing to provide him with a safe place to work. (Doc. 50 at 6-7). Specifically, Brunson contends that Apex violated Section 905(b) because:

> Apex knew or should have known that the Plaintiff would enter on to the Vessel and into the Vessel's tanks…it was foreseeable to Apex that the Plaintiff would be exposed to toxic waste water…it was foreseeable that the rain water runoff from the Apex outside storage facility contained toxic chemicals and that injury would result when the Plaintiff was exposed to toxic chemical waste. Apex failed in its turnover duties owed to the Plaintiff. It was also foreseeable to Apex that injury would result if Plaintiff entered into the Vessel's tanks that contained toxic chemicals; Apex failed to comply with safety regulations and policies and/or non-delegable duties to ensure that any persons entering confined spaces on the vessel, such as Plaintiff, should have appropriate safety gear and equipment; and it was within the privity and knowledge of Apex or Apex had actual or constructive knowledge that Plaintiff was not supplied with safety equipment by a reasonably competent employer or as otherwise required by governing maritime law; and Apex is therefore is liable for the injuries and damages claimed by failure to comply with turnover duties.

(Id. at 7).

As set forth in Federal Marine Terminals, Inc. v. Burnside Shipping Co., 394 U.S. 404 (1969), a vessel must "exercise ordinary care under the circumstances" to turn over the ship and its equipment and appliances "in such condition that an expert and experienced stevedoring contractor, mindful of the dangers he should reasonably expect to encounter, arising from the hazards of the ship's service or otherwise, will be able by the exercise of ordinary care" to carry on cargo operations "with reasonable safety to persons and property." See also Scindia Steam Nav. Co. v. De Los Santos, 451 U.S. 156 (1981);[11] Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 98 (1994); In re Knudsen, 710 F. Supp.2d 1252, 1269-1274 (S.D. Ala. 2010). A corollary to the turnover duty requires the vessel to warn the stevedore "of any hazards on the

---

11 Neither the "active operations duty" nor "duty to intervene" are asserted by Brunson; thus, they are not at issue in this case.

ship or with respect to its equipment," so long as the hazards "are known to the vessel or should be known to it in the exercise of reasonable care," and "would likely be encountered by the stevedore in the course of his cargo operations[,] are not known by the stevedore[,] and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. Scindia, 451 U.S. at 167; Marine Terminals, 394 U.S. at 416.

Additionally, "fault in the abstract is not sufficient. To produce liability, the acts of negligence or conditions of unseaworthiness must be a contributory and proximate cause of the accident." In re Royal Caribbean Cruises Ltd., 2013 WL 425837 (S.D. Fla. Feb. 4, 2013) (citing Hercules, 768 F.2d at 1566). Thus, breach of a turnover duty is actionable only if it is the legal cause of the injury – *i.e.*, the breach of a Scindia duty must have been a "substantial factor" in the injury. See, e.g., Moore, 353 F.3d at 383; In re Knudsen, 710 F.Supp.2d at 1269.

Upon consideration, Apex's motion is **CARRIED TO TRIAL.**

C. **General Negligence: Count Three**

As detailed *supra*, Apex has been deemed a vessel as a matter of law. Section 905(b) provides the *exclusive* remedy against a vessel owner for negligence. See, e.g., Norfolk Shipbuilding & Drydock Corp. v. Garris, 532 U.S. 811, 818 (2001) (stating that the LHWCA "provides nonseaman maritime workers…see § 902(3) (defining covered employees), with no-fault workers' compensation claims (against their employer, § 904(b)) and negligence claims (against the vessel, § 905(b)) for injury and death. As to those two defendants, the LHWCA expressly pre-empts all other claims, §§ 905(a), (b)[]"). Thus, Brunson's general negligence claim (Count Three) against Apex is superfluous and is due to be dismissed.

Moreover, even if the general negligence claim were not precluded under Section 905(b), with regard to Apex's motion for summary judgment on his general negligence claim, Brunson contends – *for the first time* – that Apex is negligent under a premises liability theory (Doc. 262 at 19-20). Brunson, however, did not allege premises liability negligence in his Verified Complaint. (Doc. 50 at 8). Rather, Brunson specified that his general negligence claim against Apex was about the vessel and the vessel's tanks and Apex's duty of care to him while he was cleaning the vessel's tanks – not Apex's premises. (Id.) Brunson cannot create new claims, or amend his complaint, in response to summary judgment. The Court will not consider this "new" claim because Brunson cannot assert new allegations or arguments raised for the first time on response to summary judgment.[12]

**D.** **Wantonness**

Apex did not initially move for summary judgment on Brunson's wantonness claim. However, in its Reply to Brunson's Response to its motion, Apex contends that wantonness is also subsumed under Section 905(b). Brunson did not address wantonness in his Response. The Court agrees that all of Brunson's state law claims, which includes his wantonness claim, are subsumed under Section 905(b).

---

[12] See, e.g., Herring v. Secretary, Department of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005) (stating "[a]s we have repeatedly admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotes omitted); New Hampshire Ins. Co. v. Wiregrass Const. Co., 2011 WL 206191, *2 at note 2 (S.D. Ala. Jan. 20, 2011) (same); Park City Water Authority v. North Fork Apartments, L.P., 2009 WL 4898354 at *1 n. 2 (S.D. Ala. 2009) (citing cases from over 40 districts applying the rule in 2009 alone); Abrams v. Ciba Specialty Chemicals Corp., 663 F.Supp.2d 1220, 1232 at note 16 (S.D. Ala. 2009) (providing that "new arguments are impermissible in reply briefs"); Evans v. Infirmary Health Services, Inc., 634 F.Supp.2d 1276, 1285 at note 14 (S.D. Ala. 2009) (instructing that "this Court's general practice is not to consider new arguments raised in a reply brief").

### III. Conclusion

Accordingly, Apex's motion for summary judgment is **GRANTED in part** as to Brunson's state law claims for negligence and wantonness; and Brunson's LHWCA claims are **CARRIED TO TRIAL**.

**DONE** and **ORDERED** this the **25th** day of **November 2013.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**